Filed 2/27/25  In re S.B. CA3

NOT <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| In re S.B. et al., Persons Coming Under the Juvenile Court Law. | C099906 |
| SUTTER COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.B.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. DPSQ210000001, DPSQ210000002, DPSQ210000003, DPSQ210000004, DPSQ210000005, DPSQ210000006, DPSQ210000007, DPSQ220000046) |

M.B., mother of the minors, appeals a juvenile court order removing her eight children from her custody.  She contends insufficient evidence supports the court's finding that removal was necessary to protect the children from a substantial risk of harm.  We reject her argument and affirm.

1

BACKGROUND

I

*Prior Orders Removing Mother's Children*

Mother has eight children born between 2010 and 2021. R.S. is the father of all but the oldest of the children. Over the years, courts have removed the children from mother and father's custody on several occasions. A juvenile court first removed the children in 2020 after a child welfare agency filed a dependency petition alleging, among other things, that several of the children were dirty with rotten teeth, that father submitted a urine sample testing positive for cocaine, and that mother used a dog shock collar on two of the children for potty training and discipline. The court later ordered the children returned to mother and father and dismissed the petition in 2021.

A little over a year later, in late 2022, another juvenile court removed the children from mother and father's custody after the Sutter County Health and Human Services Department (Department) filed the dependency petition in this matter. The Department alleged in its petition that two of the children—both described as "small"—were found unattended outside. It further alleged that one child, who was then four years old, wore a dog harness. And it alleged that the parents' home was unsanitary, citing, among other things, mold in the bathroom sink, feces throughout the home and on the walls, apparent feces stained on several of the children's legs and feet, flies swarming two sleeping children, and an 11-month-old with a dirty crib and a heavily soiled diaper.

In the months afterward, mother and father cleaned their home and described their efforts to prevent the children from leaving unattended again. They installed an alarm system that alerts the family when windows and doors open, installed two fences outside the house, and placed a metal bar at the front door to prevent the children from leaving— though after a social worker expressed concern about the metal bar being a safety hazard, the parents said they would no longer use it. The parents also said that family would stay with them over the next year to help with the children.

2

Following several home inspections and court hearings, the juvenile court ordered the children returned to mother and father, finding the parents had made adequate progress. The court also initiated the process for transferring the matter to Tehama County, where the parents had recently moved.

II

*Current Order Removing Mother's Children*

Before the matter transferred to Tehama County, the juvenile court again removed the children from mother and father's custody after the Department filed a supplemental dependency petition. The Department alleged in the supplemental petition that one week after the court ordered the children returned to the parents, an anonymous party found the two youngest children by a road around 3:00 a.m. One child was four years old, and the other was one year old. The reporting party had never seen these children before. Both children were crying, distressed, and shoeless, with the younger one wearing a dog harness. The reporting party attempted to communicate with the children, but the children only cried. After around 15 to 30 minutes, someone shouted from the parents' house and the children ran to the house. The reporting party could not see the person who shouted, but she thought it sounded like a child. The reporting party shared two photographs she had taken of the children and later testified about these events.

Mother and father disputed these allegations. They questioned the reporting party's credibility, noting that the reporting party claimed she lacked cell service when she saw the children, even though others said they had cell service in the same area. The parents also submitted a declaration from father's sister, who said she stayed with the parents on the day the two children were reported to have been found, was awake around 3:00 a.m., and would have noticed had anyone left the home at that time. A family friend testified similarly, saying that he stayed in the parents' living room that night, walked outside around 3:00 a.m. to smoke, and did not see the children during that time. A

3

security guard also testified that he drove by the parents' home around 2:00 a.m. and again at 3:30 a.m., and he did not see anything unusual.

Mother's three oldest children also disputed the reporting party's allegations when talking to a social worker, saying that none of the children are ever outside the home at night. But the social worker, focusing on the oldest child, said he found the child untruthful, explaining that the child avoided eye contact when discussing the matter. The social worker also said that mother had multiple times discouraged her oldest child from talking to authorities, texting him, for instance, "Thank you for fucking me over again. Why do u tell cps anything?"

In the end, the juvenile court accepted the reporting party's characterization of the facts, finding her "very, very credible" and finding the parents' witnesses—who all happened to be around the home and awake around 3:00 a.m.—"virtually impossible" to believe. The court found placement of the children with the parents had not been effective in the protection of the children. It further found a substantial risk of harm if the children were returned to the parents and ordered them removed from the parents' custody. Mother filed a timely notice of appeal in November 2023. After delays in preparing the record and multiple requests from both parties to extend the briefing schedule, this case was fully briefed on November 21, 2024.

DISCUSSION

Mother contends insufficient evidence supports the juvenile court's decision to remove the children from her custody. She argues, in particular, that the evidence fell short of satisfying the standard for removal described in Welfare and Institutions Code[1] section 361.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

# I

## *Section 361*

We first consider section 361's applicability. Before removing the children here, the juvenile court applied the standards described in two statutes—sections 361 and 387. Both statutes discuss a juvenile court's authority to remove a child from a parent's physical custody. Section 361 is in a part of the code covering judgments and orders in dependency matters. It provides, in relevant part, that a juvenile court cannot order a child removed from their parents' physical custody unless it finds "clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the [parents' custody]." (§ 361, subd. (c)(1).)

Section 387, in turn, is in a separate part of the code covering changes to judgments and orders in dependency matters. When discussing this case's procedural history, we noted that the Department filed a dependency petition and later a supplemental dependency petition. It filed the latter under section 387. That statute authorizes a juvenile court to "chang[e] or modify[] a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution . . . after noticed hearing upon a supplemental petition." (§ 387, subd. (a).) It adds, as relevant here, that "[t]he supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the . . . protection of the child . . . ." (*Id.*, subd. (b).)

With one exception, courts have found both sections 361 and 387 applicable when a court is considering removing a child from a parent following a section 387 petition. Under these authorities, a juvenile court must follow a two-step process before the

5

removal. First, the court must find, by a preponderance of the evidence, that the child welfare agency has made the showing required under section 387—that is, that the previous disposition has not been effective in the rehabilitation or protection of the child. Then, the court must find, by clear and convincing evidence, that removal of the child is appropriate under section 361. (*In re D.D.* (2019) 32 Cal.App.5th 985, 990; see *In re Javier G.* (2006) 137 Cal.App.4th 453, 461; see also *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163 ["When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361"]; *In re Paul E.* (1995) 39 Cal.App.4th 996, 1003 [same].) That is the approach the juvenile court followed here.

One court, however, favored a more limited application of section 361. The court in *In re A.O.* (2010) 185 Cal.App.4th 103 appeared to accept that section 361 could at times apply when a section 387 petition seeks to remove a child from parental custody. But it doubted that section 361 "*always must apply* at the 'disposition' phase of a hearing on a section 387 petition." (*In re A.O.*, at p. 112.) The court appeared to believe that section 361's applicability depended on the answer to the following question: Did the juvenile court remove the child under section 361 at an earlier stage of the proceedings, say, in the initial disposition or following a previous section 387 petition? If it had not previously removed the child, then the *A.O.* court suggested that the juvenile court would need to apply section 361 before removing the child from the parents. But if it had previously removed the child, and the child was later returned to the parents, then the *A.O.* court suggested that the juvenile court would not need to apply section 361 before removing the child again; it instead would only need to find, by a preponderance of the evidence, that the child welfare agency had made the showing required under section 387. (*In re A.O.*, at pp. 111-112.)

In this case, we have the latter scenario mentioned in *A.O.*—where the juvenile court removes a child from parental custody under section 361 in its initial disposition,

6

returns the child to parental custody, and then considers removing the child once again following a section 387 petition. Considering these facts and citing *A.O.*, the Department suggests that the juvenile court here might not have needed to apply section 361, though the Department does not take a definitive position on this issue. Mother, on the other hand, takes a different approach—she entirely ignores *A.O.*'s discussion on this topic. Rather than address the merits of *A.O.*, we will assume that the juvenile court needed to find removal appropriate under section 361 before removing the children—which is to say, it needed to find, by clear and convincing evidence, that there is or would be a substantial danger to the children if they were returned home and that there are no reasonable means to protect the children without removing them from their parents' custody. (§ 361, subd. (c)(1).)

## II

### *Substantial Evidence*

We now turn to mother's challenge to the sufficiency of the evidence under section 361. Having assumed section 361 applies, we will review the juvenile court's decision in a manner mindful of that statute's heightened standard of clear and convincing evidence. In particular, we will review the entire record in the light most favorable to the court's decision to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could make the required finding under section 361 with the confidence required by the clear and convincing standard. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996, 1001, 1005.) In doing so, we will not reweigh the evidence. Nor will we second guess the juvenile court's resolution of conflicting evidence. (*Id.* at p. 1008.)

Applying this standard here, we find substantial evidence supports the juvenile court's decision. Because past conduct can be probative of current circumstances (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), we recount the circumstances giving rise to the initial petition in this matter. Department social workers visited mother and father's

home in late 2022 after learning that two of their children—both described as "small"—were found unattended outside.  On arriving at the home, the social workers found one of the children, then four years old, wearing a dog harness, which another child said the parents used in the house.  They also found the home unsanitary, finding, among other things, feces throughout the home and on the walls, apparent feces stained on several of the children's legs and feet, and flies swarming two sleeping children.  Following a hearing, the juvenile court found removal of the children necessary.

Several months later, after finding mother and father had made adequate progress, the juvenile court ordered the children returned to their custody in 2023.  But just one week later, a person driving through reported finding the two youngest children—a four-year-old and a one-year-old—on the side of a road around 3:00 a.m.  Both children were crying, distressed, and shoeless, and the one-year-old wore a dog harness.  The reporting party attempted to communicate with the children but "they just kept crying."  After around 15 to 30 minutes, someone—sounding to be a child—called out from the parents' house and the children ran to the house.  An officer later described the area where the children were found as a high-crime area.

On this record, the juvenile court could find, as it did, that removal of the children was appropriate under section 361.  In particular, it could find, by clear and convincing evidence, that there is or would be a substantial danger to the children if they were returned home and that there are no reasonable means to protect the children without removing them from their parents' custody.  (§ 361, subd. (c)(1).)  The circumstances in 2023 did not mirror all those in 2022, lacking, in particular, the earlier unsanitary conditions.  But mother had her children removed in 2022 in part because her young children were left unattended outside.  And only days after her children returned to her custody in 2023, her two youngest children were found by a road around 3:00 a.m., with both appearing distressed.  The juvenile court could find removal appropriate under those circumstances.

8

Mother argues otherwise. She contends the juvenile court could not find a substantial risk of harm to the children, because she implemented additional safety measures to prevent the children from again leaving the home unattended. Those measures include "additional security cameras," "additional fencing," child safety locks on the doors, and the potential assistance of family. She further contends social workers, teachers, and respite care providers (who could help watch mother's children) could observe the children, serve as neutral reporters, and render removal unnecessary. We disagree.

To start, several of mother's offered measures—"additional security cameras" and "additional fencing"—are far too vague to advance her position. In referencing "additional" cameras and fencing, mother acknowledges that both cameras and fencing were already in place before the reporting party found the children outside. Yet mother's two youngest children still ended up unattended by a road around 3:00 a.m. Mother never explains how "additional" cameras and fencing would change anything, nor why the original cameras and fencing were inadequate. And while she claims that a "social worker agreed that the safety upgrades the parents installed would mitigate the risk of any child leaving the house unattended," she cites nothing in the record showing this agreement. Her record cites instead show that a social worker believed securing the perimeter of the property and installing childproof locks could "possibly" mitigate risks, not that the "additional" fencing and cameras that the parents actually installed could possibly mitigate risks.

Several more of mother's offered measures—the potential assistance of family and the ability of neutral observers to report issues—are not meaningfully different from the measures in place before the reporting party found the children on the side of the road. Before the children were returned to the parents' custody in 2023, mother and father said that family would stay with them over the next year to help with the children. Father's sister even claimed to be staying with the family the day the two children were found by

9

the road. A family friend said the same. Around that time, moreover, social workers and teachers could observe the children to a degree and serve as neutral reporters. Still, even with these neutral reporters and family assistance, mother's two youngest children ended up alone on the side of a road around 3:00 a.m. And to the extent mother's other children were familiar with these events, none reported them to any neutral reporter—which is perhaps not surprising considering mother's history of discouraging her children from speaking to authorities. Under these circumstances, the juvenile court had no reason to believe that the potential for family assistance and neutral reporters would diminish the risk to the children.

Mother is left, then, with the child safety locks. She says she and father shared a video in the juvenile court showing these child safety locks, with all counsel stipulating to the addition of these locks. But while father's counsel in the juvenile court said she had a video showing these locks, she never appeared to show the video because of technical difficulties, resorting instead to describing what she believed the video would show. And while the Department's counsel stipulated that "there are cameras and locked doors" at the home, we cannot find (and mother has not cited) any stipulation about the child safety locks. Supposing nonetheless that the record evidences these locks, the juvenile court could still find that a substantial risk to the children persisted. As we covered already, the court ordered the children removed from mother's home in 2022 in part because two of her children were found outside unattended. Mother retained custody in 2023. But only a week later, a driver found two of mother's children, alone and distressed, on the side of a road. Considering this history, along with outstanding questions about how a one-year-old and a four-year-old ended up by the road around 3:00 a.m., the juvenile court could find the child safety locks inadequate to meaningfully diminish the risk to the children.

DISPOSITION

The 2023 order removing mother's children from her custody is affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
EARL, P. J.

_____/s/_____
FEINBERG, J.

11